## STATE *vs.* JOHN GORDON.

Three brothers, Nicholas, John, and William, were indicted for murder ; Nicholas as accessary before the fact, John and William as principals. Upon the trial of John and William, the Court held that the government, without having shown any conspiracy or confederacy between the said John, and Nicholas his brother, might be permitted to present to the jury evidence of expressions of hostility towards the deceased, uttered by the said Nicholas in the presence of John, but not responded to or acquiesced in by him, as testimony, which, taken in connexion with the friendly and fraternal relations, existing between the said John and Nicholas, might go to prove a motive on the part of John for committing the crime.

*Held further*, that evidence having passed of expressions of hostility on the part of Nicholas, uttered in the presence of John, evidence might further be admitted of a *cause* for hostile feelings on the part of said Nicholas towards the deceased.

Where evidence has passed to the jury without objection, which if objected to might have been found inadmissible, the Court will not grant a new trial upon objections to such testimony made after verdict.

Whether minutes of a conversation or testimony, of which the witness swears that he recollects nothing further than that he intended such minutes should be correct, can be read in evidence or not—quaere ?

THIS was a motion for a new trial on an indictment *for murder.* The indictment was found against Nicholas S. Gordon, as accessary before the fact, and against John and William Gordon as principals. John and William were tried jointly, previous to the trial of Nicholas. The murder was committed upon Amasa Sprague, an opulent manufacturer resident in Cranston. The accused, Nicholas S. Gordon, John Gordon and William Gordon, were brothers, who resided in Cranston within sight of the spot where the murder was committed. They were Irishmen ; Nicholas having been in this country seven or eight years ; John and William having come over from Ireland in July, 1843. John was living with Nicholas at the time of the murder, William in Providence. It appeared that Nicholas had paid the passage of his brothers to this country and had assisted them since their arrival. Nicholas S. Gordon kept a small retailing shop, in which he sometimes employed his brother John. Sometime previous to the murder, he had applied to the Town Council of the town of Cranston for a license to retail wines and other strong liquors, and his application had been resisted by Amasa Sprague, and was not granted. Evidence was given that this fact had been stated by Nicholas, in the presence of John, accompanied by threats against Sprague ; Nicholas declaring that " he would be the death of him," " he would have his revenge," " he would run him through as quick as he could wink," and making use of other revengeful expressions. It did not appear that John, though present, either responded to or acquiesced in these expressions. The counsel for the prisoners objected to proof both of these expressions and of the fact of Sprague's opposition

to the granting of the license to Nicholas, which was put in after proof of the hostile expressions ; but the evidence was ruled in by the Court. The evidence to connect the prisoner with the crime was entirely circumstantial. For the purpose of rebutting this evidence, the counsel for the prisoners introduced, among other witnesses, Ellen Gordon, the mother of the prisoners.— The Attorney General, for the purpose of impairing and contradicting her testimony, called Edwin C. Larned, who was present at the preliminary examination before the magistrate and took notes of the examination, and who, subsequently, made report of this trial, which is alluded to in the following opinion of the Court. Having stated that he endeavored to take the notes accurately, the witness read his minutes of the examination of Ellen Gordon taken at the jail, which varied in several material points from the same testimony of Mrs. Gordon as given on the stand. The reading of these notes was not objected to at the time.

The evidence in the case was very voluminous ; but these are the points upon which the motion for a new trial was grounded. The jury returned a verdict of not guilty in favor of William Gordon, and of *guilty* against John Gordon.

After verdict of guilty against John and before sentence, he moved the Court for a new trial : because,

First : The government, without having shewn or attempted to show any conspiracy or confederacy between him the said John and Nicholas S. Gordon, his brother, was permitted to present to the jury—

1st. Evidence of expressions of hostility towards Amasa Sprague, uttered by the said Nicholas S. Gordon in the presence of said John, but not responded to or acquiesced in by him.

2d. Evidence of a supposed cause for hostile feelings on the part of the said Nicholas S. Gordon toward Amasa Sprague, to wit ; the opposing by the said Amasa of a petition of said Nicholas S. Gordon to the Town Council of the town of Cranston for a license to retail wine and other strong liquors.    And because,

Secondly : A paper purporting to be minutes of the testimony of Ellen Gordon, given before the examining magistrate shortly after the arrest of the said Jonn, was allowed to be read to the jury to contradict and impair the testimony of the said Ellen, as given for said John on the stand on his trial ; the witness producing and reading the said paper expressly declaring, that he had no recollection whatever concerning said supposed testimony, other than that he intended to report it accurately.

One of the principal counsel for the prisoner being absent at the last term, when this motion was made, the indictment was continued to the present, and now after full hearing of counsel on this motion the Court pronounced its opinion.

BLAKE and POTTER, for the State.

ATWELL, CARPENTER, CURREY and J. P. KNOWLES, for the prisoner.

DURFEE, C. J.—In a case of this importance it is very necessary to be precise and definite in the use of terms. At any rate, if terms are used which do not make precisely the same impression upon the mind of the Court, that the facts, which they purport to describe, produced, it is right that the true intent and meaning should be understood, by reference to the testimony, which actually passed. The difference between the effect of the terms here used and

that of the testimony is not great, but whatever it may be, it can easily be corrected by reference to the very copious notes, taken of the proceedings, at the time of the trial, to which both the counsel for the State and the prisoner refer, and which are not materially at variance either with the memoranda or recollections of the Court.

The Court cannot, either from those minutes or their own, say that there was no *attempt* on the part of the State *to prove a conspiracy or confederacy betewen John Gordon and Nicholas S. Gordon, his brother*, before the evidence referred to in the first specification was presented to the jury. And in reference to the first specification, it will observe that the *effect* of the evidence to which it refers, stated definitely, was that the said Nicholas, on account of the opposition of Amasa Sprague to his being licensed to sell spirituous liquors in the town of Cranston, threatened to take the life of the said Amasa, and otherwise expressed the most hostile and vindictive feeling toward him, in the presence of the said John ; he the said John remaining silent and uttering nothing in reply.

This, in effect, was the evidence passed, and to which the first specification refers. This evidence was not permitted to pass to the jury as proving, or tending *in itself* to prove, a conspiracy between the two, or even an acquiescence on the part of John ; but, as stated in the charge, that the jury might determine for themselves, what effect such declared enmity would have upon the minds of the prisoners, situated as they then were in relation to Nicholas S. Gordon. It was stated on admitting it, that the Court thought it must pass to the jury for them to judge how far such threats might effect the minds of the prisoners, so as to furnish a motive to commit the crime.

And it was added, that the relevancy of it might be il-
lustrated by supposing that the prisoners should offer to
prove that the most friendly and amicable relations, and
the kindest feelings existed between Nicholas S. Gordon
and Amasa Sprague, with a view of shewing the absence
of all motive on the part of the prisoner ; and that the
Court in such case would feel bound to admit the evi-
dence.

But why is it, that proof of the relations of Nicholas S.
Gordon to the deceased should afford any evidence of mo-
tive, or the absence of motive, in John Gordon, to commit
the crime with which he stood charged.

It is certainly true that had Nicholas S. Gordon been
an entire stranger to John Gordon, or had he borne no pe-
culiarly interesting relations to him, the evidence would
have been irrelevant, and could not have been permitted
to pass. It was necessary, therefore, before this evidence
could pass, that the existence of such relations should be
shewn by competent testimony, or, now that it has passed,
that such testimony should be found in the case. What
then was the testimony in reference to this point.

It appeared in the progress of the trial that the Gordons
were brothers, of whom Nicholas had for some time re-
sided in this country. He had some real estate in Crans-
ton, he had constructed a building thereon, part of which
was occupied as a dwelling and part as a retailer's store.
He was engaged in the sale of spirituous liquors by retail.
This was his principal business. John and William were
in Ireland. He sent for them ; paid their passage and
brought them from Boston to his residence, in Cranston,
some time in July, 1843.. At least such are the declara-
tions of Nicholas made in their presence, from which these
facts in regard to their passage from Ireland might have

been inferred, and which passed together with the testimony objected to. With Nicholas S. Gordon their mother and sister resided, and his house they made their home. The evidence shows that they were in destitute circumstances, that they were occasionally furnished by Nicholas with his own clothing. That, except when elsewhere employed, they were with him as dependants and acted as his servants. He was the head of the family. The Court does not weigh the credibility of any one of the witnesses who testify to these facts. Sufficient for the Court is it that the witnesses who testify to them are competent witnesses. But we may add, that these facts are not denied, but on the contrary, seem to have been tacitly conceded in the progress of the trial.

The facts in relation to the situation of Nicholas, that John was his brother, and that his house was the common residence of the brothers, were already before the jury, when the testimony in question was offered. And now does that testimony make John acquainted with the fact, that his brother has suffered a real or supposed injury, at the hands of Sprague, and is the depth of that injury, as felt by that brother, made known to him by the passionate manner and threatening language that he used towards the deceased?

The testimony substantially is, that Nicholas S. Gordon, some time before the fatal event, in conversation with others in the presence of John, concerning the refusal of the license at the request or on the intervention of the deceased, declared that he would be revenged of him, (the deceased,) that he would come up with him, if he lived, that he would be the death of him, with other expressions of like violent and threatening character.

State v. John Gordon.

But was this conversation heard by John ? When a witness testifies that a conversation takes place in the presence of another, he is always understood to mean that it takes place in his hearing, unless the contrary appear. At least it is on this ground that Courts have deemed such evidence competent and in this case it might well be left to the jury to determine, whether the threats and declarations in relation to this supposed injury repeatedly made in the presence of John, and of this violent and extraordinary character, could have escaped his attention.

But still, though he did hear them, what constitutes the relevancy of these conversations, The accused took no part in them, he was silent—he did not at the time signify any approval of the threats of Nicholas, and these threats are not to be imputed to him. How then do these conversations become relevant. The answer is, that they become relevant from the simple fact, that, they bring home to John a knowledge of the injury or supposed injury, which his brother Nicholas had suffered from Sprague, and raveal to him the extent of that injury by the vindictive language that it called forth. But still it has been argued that all this does not justify any inference of motive, good or bad, on the part of John, he remaining silent.

In deciding whether these facts would justify an inference of motive of any kind, the Court must be guided by those general laws or principles, which govern all minds, —laws, which continue the same through all ages, in all countries and in all conditions of life, changing only in their manifestations, as various objects, occasions, propensities and dispositions bring them into action. It is upon these principles that the whole evidence in the case has passed to the jury. Since the contrary has not been

shewn, the prisoner has been deemed a rational being, subject to the same passions and actuated by motives, arising under the same circumstances, as those in which move the generality of mankind. It is upon this basis that he is held accountable, as a moral agent, and is made amenable to criminal law.

But if we take those general laws for our guide, then it is impossible for the Court to say that John Gordon, standing related as he stood to Nicholas, [could be apprised of this supposed injury and the extent of it, and regard the fact with perfect apathy and indifference.

In what age of the world, in what country or condition of life, the feelings of kindred and blood retaining their natural influence, has an injury, real or supposed, done to a brother, a sister, a parent or a child, been regarded as a matter of no concern and been no cause of feeling or emotion ? The cases are innumerable in which such injuries have provoked the effusion of blood. The Court, governing its judgments by these general principles, could not but decide, that evidence which went to prove that John Gordon knew that his brother had suffered a great injury, real or supposed, at the hands of Sprague, was evidence, from which the jury might infer some motive to action of some kind against Sprague and in behalf of that brother, whom he regarded as his superior and on whom he was to a great degree dependent. It might weigh little—it might weigh much—something it must weigh ; but if it weighed any thing, the Court was bound to permit it to pass.

If A, strike B, and C, the brother of B, return the blow, though without saying a word, can it be doubted that the blow given by A, may be proved, as the cause which provoked C to strike. But it may be said that C's blow fol-

lowed immediately upon the injury to B, whereas in the case at bar, considerable time had elapsed after the knowledge of the supposed injury done to Nicholas, before the homicide was committed, and that there is not the same connexion between the events as in the case supposed. This may be very true, but it should be recollected that the injury continued just as pressing and the relations of all parties the same on the day of the fatal deed, as at the time of the conversation in evidence, and that there may as truly be a connexion of cause and effect in moral events, where, all the relations continuing the same, one event follows another on the first opportunity, as in the case supposed, where the succession is immediate.

There seems to have been an impression on the part of the counsel for the accused, that the Court permitted this evidence in regard to motive, to pass to the jury as strengthening the circumstantial evidence on which the conviction was founded. But this is not the *direct object, in* any case, though it may be an incidental result, of proving a probable motive to commit the crime charged. Each of the circumstances which go to convict the accused may be proved by incontrovertible evidence, and yet, in the absence of all motive to commit the deed, the mind may shrink from the conclusion of guilt to which the evidence almost irresistibly impels it. Actuated by the laws which its creator has ordained for its government, the mind remains unsatisfied with its own apparently legitimate inferences. It perceives an effect without an appropriate moving cause, and it is to satisfy its demands in this particular, that proof of a motive becomes essential.

What may be deemed an adequate or sufficient motive to satisfy the demands of the mind in this particular, is a question not for the Court but the jury. That proof of

motive, whatever it may be, which gives the mind full confidence in the truth of its conclusions is all that is absolutely necessary, and the Court is bound to pass any evidence to the jury, which has this tendency. Some affection of mind must ever result to one, who believes, or thinks, that a stranger is injuring a brother or other near connection, especially if he be in any respcet dependant upon him. In itself, as all experience teaches, it is a cause of suffering, or more commonly, also, a motive for action of some sort against the offending party. What that action may be, is never to be inferred from the motive only, but is to be proved by separate and independent testimony. Hence a very slight provocation may, in some cases, be proven to have resulted in deeds the most atrocious ; whilst in others, a very great provocation, may be shewn to have terminated only in patient endurance and quiet suffering. But some result must ever follow.

The proof, therefore, of declarations and threats, which brought home to the knowledge of the accused the real or supposed injury done by the decesed to his brother Nicholas, and that brother's vindictive feelings towards the deceased, was of such a nature that the Court could not do otherwise than permit it to pass to the jury. Some result must follow from it, but what that result was, could not be proved by, or inferred from, the affection or motive only, but was to be shewn by other independent testimony in the cause.

The second specification of reasons for the granting of a new trial is, that the Court permitted evidence to pass to the jury, that the said Amasa Sprague opposed the petition of the said Nicholas S. Gordon, to the town council of the

town of Cranston, for a license to retail wine and other strong liquors.

But for the proof that Nicholas had, in the presence of John, spoken of the taking from him of the license as a wrong which he would avenge, even by the death of Sprague, this evidence must have been deemed immaterial and could not have been permitted to pass. But, connected as it is with that testimony, it properly passed, if only for the purpose of rebutting an inference, that the threats and declarations, aforesaid, being the language of excited feeling, might be mere bluster and misrepresentation of the fact. If these declarations might pass to the jury for the purpose of bringing home to the knowledge of John the fact, that Nicholas had been deprived of his license by the intervention of Sprague, evidence could certainly be permitted to pass, for the purpose of rebutting any erroneous inference, that might be drawn from the excitement under which the declarations were uttered. If it was legal to bring the fact home to the knowledge of John, it was legal to shew definitely and certainly what that fact was, and that the license was withdrawn under such circumstances, as would account for the vindictive feelings expressed. It never has been doubted, that evidence to rebut an inference, however erroneous, might be permitted to pass, and the Court cannot deem the evidence in question, passing for that purpose, incompetent or altogether immaterial.

But the motion sets forth another ground for a new trial, in that a paper purporting to be the minutes of the testimony of Ellen Gordon, given before the examining magistrate, shortly after the arrest of the said John, was allowed to be read to the jury, to contradict and impair the testi-

mony of the said Ellen, as given for the said John, upon the stand on the trial ; the witness producing and reading said paper expressly declaring, that he had no recollection, whatever, concerning said supposed testimony, other than that he intended to report it accurately.

This paper was offered and read,—the witness was examined and cross-examined and the whole testimony passed to the jury without objection, on the part of the accused, at the time of its admission.

It is believed that, according to all the authorities, when testimony passes under such circumstances, its admission can afford no ground for a new trial. Though objected to in a subsequent stage of the proceedings, yet, unless the objection were waived under some misapprehension or mistake, it would seem hardly reasonable to rule it out. But after verdict, the reason seems even stronger for not granting a new trial on this ground, especially considering that a further examination of the witness, on the part of the prosecution, had the objection been made in season, might have removed every impediment.

The Court cannot say that it would have been rejected, for the very reason that no objection was made. The witness testified that he, being present at the examination, was requested to take notes—that he took them as accurately as he could. This necessarily implies that he believed them, at the time, to be as accurate as he could make them. The accuracy of the witness as a reporter is not questioned—indeed it seems conceded by a reference to his notes, taken of this very trial, by the counsel for the prisoner. But if he be an accurate reporter, and if he remembered that he took the notes as accurately as he could, and believed them to be as correct as he could make them, he certainly migh t have refreshed his memory by an ex-

amination of them. Had there been an objection to the
reading of them, he might have been put to the necessity
of examining them, and had they failed to refresh his
memory, the objection might then have been fully con-
sidered and perhaps sustained ; but the paper was read,
without any such previous trial of the memory of the wit-
ness, and passed, as of course, there being no objection on
the part of the counsel.

The rule which makes notes, taken at the time of the
conversations to which they relate and which the witness
swears he intended at the time should be accurate and be-
lieves to be correct, mere memoranda by which the wit-
ness can be allowed only to refresh his memory, is a rule
whose reason is not so imperative, but that American
Courts have sometimes permitted the notes themselves to
be read to the jury, though at the time of testifying the
witness recollected nothing further than that he intended
to make them correct. (1. Greenleaf 437, note.) Without
meaning to say here, that we adopt this rule, it is yet not
easy to see its unreasonableness ; and where such notes
have been read, without objection, no one questioning their
correctness, the Court cannot find, in the fact of their ad-
mission, a sufficient reason for granting a new trial. It is
not in any manner apparent that they have led to an
erroneous verdict.

It may be proper to observe, before closing these re-
marks in reference to the first specification, that at the time
the testimony was admitted, concerning the threats and
declarations of Nicholas S. Gordon, made in the presence
of John, the Court were and still are of opinion, that there
was sufficient evidence preparatory for its admission, by
the testimony, then in, touching the peculiar and interest-
ing relations of the brothers ; but this testimony was so

strengthened, by that which followed concerning the circumstances and manner in which John was brought into the country and the extent of his dependence on Nicholas, that could there have been any question on this point at the time, there could have been none, when the testimony was all in; and we are not now settling the question merely whether the testimony properly passed at the time it was admitted, but whether, considered in connexion with all the testimony in the case, it was relevant to the issue and could be legally taken into consideration by the jury.

After having given all the specifications contained in the motion a full consideration and with an earnest desire to come to a just conclusion, we feel ourselves constrained, no less by the force of reason, than the rules of law, to overrule the motion of the accused for a new trial.